(October Term, 1937)

# HANNA STATE & SAVINGS BANK v. MATSON, ET AL.

(No. 2018; March 22, 1938; 77 Pac. (2d) 621)

2

For the defendant and appellant, there was a brief by *A. R. McMicken* and *Eph U. Johnson,* both of Rawlins, and oral argument by *Messrs. McMicken* and *Johnson.*

4

For the plaintiff and respondent, there was a brief by *Armstrong & Armstrong* of Rawlins, and oral argument by *Mr. L. E. Armstrong*.

6

KIMBALL, Justice.

The Hanna State and Savings Bank, plaintiff and

respondent, brought this action in May, 1935, to recover on three promissory notes for $370, $11,200 and $100, respectively, and for foreclosure of a chattel mortgage given as security. The defendants were Carl Matson, maker of the notes and mortgagor of the property, and Gust Nelson who was made a party because he claimed an interest in a part of the mortgaged property.

Matson answered by denying generally the allegations of the petition, but he had no real defense and has not appealed. Nelson in his answer alleged that he was the owner of the cattle described in the mortgage. The trial was to the court without a jury and resulted in a judgment against Matson for the debt, foreclosing the mortgage, and declaring that Nelson is barred from asserting any interest adverse to the plaintiff in the mortgaged cattle. Nelson has appealed, and attacks the part of the judgment that denies his asserted right.

The chattel mortgage was executed by Matson in November, 1933. The cattle claimed by Nelson are described in the mortgage as 210 head branded oarlock. They are the increase of three lots of cattle, called the Leo Company cattle, the Pinedale cattle and the Moles cattle, bought in the years 1920, 1922 and 1923, respectively. The rights of the parties to the appeal depend on the effect to be given to a series of transactions following the first purchase of cattle in 1920.

In 1920 appellant was a man of means and good credit, engaged in rather a large way in the ranch and livestock business. He was a customer of the respondent bank whose cashier was in the habit of advising and assisting him in his business affairs. Defendant Matson and one Otto Bennard were young men whom appellant called "the boys." Bennard was appellant's brother-in-law. The boys were without financial resources, and appellant, taking a fatherly interest in

them, was willing to assist them in getting a start in business.

In November, 1920, appellant agreed to buy of the Leo Sheep Company 1560 acres of land and some personal property that included 185 head of cattle bearing the oarlock brand. The purchase price was $25,000 of which $10,000 was to be paid before transfer of the property, $2,000 by December 1, 1923, and $13,000 by December 1, 1925, deferred payments to be secured by mortgages on the property. During the negotiations, respondent agreed to lend appellant $10,000 with which to make the down payment. Later, but before the deal between appellant and the Leo Company was consummated, appellant, Matson and Bennard came to the respondent bank and appellant then told respondent's cashier that he was buying the Leo Company's property for the boys and would turn it over to them for what he was paying for it. Appellant wanted respondent to lend the $10,000 for the down payment to the boys instead of to him, but this respondent refused to do as the boys had no financial responsibility and the property to be turned over to them would be incumbered by mortgages to the Leo Company to secure $15,000 of the purchase price. It was finally decided that appellant would go ahead with the purchase from the Leo Company as originally contemplated. The money for the down payment was lent by respondent to appellant, and its repayment secured by mortgage on cattle which appellant already owned. Deed for the real property and bill of sale for the personal property from Leo Company to appellant were delivered. The property was turned over to Matson and Bennard and the arrangement between them and appellant was evidenced by (1) the promissory note of Matson and Bennard, for $10,000, dated December 1, 1920, due December 1, 1925, payable to appellant, and (2) a written contract dated December 1, 1920, between appellant

and Matson and Bennard, purporting to set forth the conditions on which the property was turned over.

This contract was put in writing by respondent's cashier and a copy was kept at the bank. The writing refers to the agreement whereby appellant acquired the right to buy the Leo Company real and personal property, and declares that appellant has agreed with Matson and Bennard "for the sale to them of the benefit of said agreement"; that appellant "does hereby assign" to Matson and Bennard the "agreement of sale and all the estate, right, title and claim of [appellant] in or to the said real estate and personal property therein described * * * subject to the stipulations hereinafter mentioned," and that upon the performance by Matson and Bennard of the covenants by them to be performed, appellant will execute and deliver deed and bill of sale to them of the property. Matson and Bennard agreed to assume all the obligations of appellant to the Leo Company, to pay taxes and to commit no waste. It was further provided "that during the continuance of this agreement [Matson and Bennard] shall have no right nor power to sell or dispose of the property hereby conveyed, nor to sub-let the same, without the consent in writing of [appellant]."

The oarlock brand was transferred to appellant by the Leo Company in April, 1921, but has been used only by Matson and Bennard in branding the increase of the cattle obtained from the Leo Company and other cattle about to be mentioned that were acquired by Matson and Bennard. Appellant's cattle, in which Matson and Bennard had no interest and which are not involved in this action, were branded TE, another brand owned by appellant.

In May, 1922, appellant bought the Pinedale cattle, 166 head, for $6,160. The purchase price was advanced by respondent on the promissory note of Matson and Bennard, guaranteed by appellant by separate writing.

This loan was the origin of the indebtedness which, after frequent renewals covering the original debt and additional advances, was finally evidenced by the notes in suit. The Pinedale cattle were delivered to Matson and Bennard, branded with the oarlock brand, and mingled with the Leo Company cattle, with appellant's knowledge and consent. The indebtedness for the purchase price was reduced to $5,000 in the fall of 1922 by payment of $1,160, proceeds of a sale of part of the oarlock cattle by Matson and Bennard. On November 27, 1922, the $5,000 indebtedness was evidenced by a renewal note signed by Matson and Bennard, payable to themselves, and secured by a chattel mortgage from the makers to appellant on 375 head of cattle branded oarlock, together with the brand. The 375 head included both the Leo Company cattle and the Pinedale cattle. The note was endorsed by the makers and by appellant and held by respondent.

On April 2, 1923, Matson and Bennard bought of Mrs. Moles some land and 37 head of what are called the Moles cattle. The purchase price was advanced by respondent on the note of Matson and Bennard to appellant, endorsed by appellant to respondent, and secured by real and chattel mortgages on the purchased property. These cattle also were branded oarlock by Matson and Bennard, with appellant's knowledge and consent, and mingled with the Leo Company cattle and the Pinedale cattle. The note for the money advanced by respondent in this transaction is not involved in this action. When it was renewed it was secured by a real estate mortgage only.

In November, 1923, when the $5,000 note signed by Matson and Bennard, held by respondent, became due, the indebtedness had grown to $5,875, and the renewal note for that amount, and the chattel mortgage as security, were made directly to respondent. This mort-

gage covered all oarlock cattle—Leo Company, Pinedale and Moles.

The note and mortgage from Matson and Bennard to respondent were renewed many times from 1923 to 1933. After 1925 the renewals were by Matson alone, as Bennard in the summer or fall of that year withdrew from the business. The debt increased from $5,875 in 1923 to $11,670 when this suit was brought. Most of this increase was the result of accumulating interest and advances for running expenses of the business. A rather large increase in 1926, from $6,500 to $9,440, was due to the borrowing of the money to build a barn.

In the meantime, in December, 1925, the chattel mortgage from appellant to the Leo Company was released, and thereafter the respondent claimed that its several successive chattel mortgages gave it a first incumbrance on all the cattle held by Matson and branded with the oarlock brand. As the cattle were intermingled and branded alike, there is no way to distinguish the increase of the Leo Company cattle from the increase of the Pinedale and the Moles cattle. Of course, all of the original stock, 388 head, bought in 1920-1923 are gone. Some cattle were sold each year. Apparently no one was able to tell how many were sold, but the number sold exceeded the increase, as only 210 head remaining in 1933 when the mortgage in suit was given.

Neither party requested the court to make findings of fact, and the judgment against defendant Matson was on a general finding for respondent. As to appellant, however, the judgment order, as therein recited "makes the following special findings of fact and conclusions of law," of which we give this short summary: That on November 24, 1920, Nelson purchased from the Leo Company 185 head of cattle, and on December 1, 1920, entered into the contract with Matson and Bennard, and that under said contract, of which plaintiff at all times had notice, Nelson retained title to said

cattle. That thereafter the Pinedale and Moles cattle were purchased and turned over to Matson and Bennard, and all branded by direction of Nelson with the oarlock brand owned by Nelson. That Nelson is still the owner of the increase of the cattle purchased from the Leo Company, but that because of his act in causing the Leo Company cattle, together with the Pinedale and Moles cattle, to be branded with the same brand, it is impossible to distinguish the Leo Company cattle and their increase from the other cattle, and that, therefore, Nelson is estopped to set up his said title to the Leo Company cattle or their increase as against the plaintiff.

In view of evidence showing that the Pinedale and Moles cattle were bought by Matson and Bennard with money advanced to them by the respondent, appellant is forced to abandon his claim to those cattle, but contends that the trial court erred in holding that respondent's mortgage is a valid incumbrance on the increase of the Leo Company cattle, and suggests a formula, which we need not describe, for ascertaining appellant's claimed proportionate interest in the total number of intermingled increase.

Almost the whole of appellant's argument in this court is on the question of confusion of goods. He contends that his act in causing all the cattle to be branded with the same brand and intermingled was innocent and rightful, known to respondent when the successive mortgages were given, and that in such circumstances the several owners of the intermingled property retain their title to their respective proportions of the whole. See Edwards v. Willson, 30 Wyo. 275, 281, 219 Pac. 233; State Bank of Wheatland v. Bagley Bros., 44 Wyo. 244, 284, 11 P. (2d) 572, 583. We may grant that this contention on the facts therein stated would succeed. It does not follow that the judgment should be reversed, but only that the record must

show other facts to support the declaration of estoppel. It is true that recitations in the judgment order lend support to the view that the trial court held that the conclusion that appellant was estopped from claiming the increase of the Leo Company cattle was based on the mere fact of intermingling. But we think it clear that the court's findings of fact were not intended to be complete. They were not made on request, as provided by section 89-1321, and if they had been, would probably not be of controlling effect here, as all the evidence is brought up for the purpose of having us consider the assignment of error that the judgment is not supported by the evidence. See, Hilliard v. Douglas Oil Fields, 20 Wyo. 201, 122 Pac. 626. We think it probable that the court undertook to find only sufficient facts to show that its judgment was based on estoppel and not on the ground that Matson was the owner of the Leo Company cattle as between him and appellant.

Though the respondent argues that the contract of December 1, 1920, between appellant and Matson and Bennard, does not show the intention of the parties that appellant should retain title to the Leo Company cattle, we shall on that point, without discussing the evidence, accept the trial court's finding. We therefore assume that the contract, as it affected the cattle, was a conditional sale with title retained by appellant, the seller. The question, then, is whether there is evidence to support the judgment on the ground that appellant is estopped to assert his title as against the respondent's rights under its mortgage. On that question we must assume that in case of conflict in the evidence the trial court found the facts that support the judgment and are not inconsistent with the facts specially found. See Ruble v. Atkins, 39 Ia. 694, 697; Smith v. Penny, 44 Calif. 161, 166; Farwell Co. v. Lykins, 59 Kan. 96, 99, 52 Pac. 99; Tom Reed Gold Mines Co. v. United Eastern Mining Co., 24 Ariz. 269, 293, 209 Pac. 283, 292; Trus-

tees of Easthampton v. Bowman, 136 N. Y. 521, 525, 32 N. E. 987.

In November, 1922, respondent was holding the note of Matson and Bennard for $5,000 borrowed to pay for the Pinedale cattle. The note was guaranteed by appellant. It was suggested that there should be a mortgage on the cattle to protect appellant, as guarantor. Both appellant and respondent thought that, as the Pinedale cattle had been mingled with what remained of the Leo Company cattle, the mortgage should cover all cattle bearing the oarlock brand. Accordingly, the mortgage of November 27, 1922, from Matson and Bennard to appellant, covering all the intermingled cattle, was given and transferred by appellant to respondent. The acts of appellant in participating in this transaction were inconsistent with the theory that he retained the title to the Leo Company cattle described in the mortgage. See Jones on Chat. Mtg. (Bower's ed.) § 1229; note 95 A. L. R. 332.

In November, 1923, it was suggested that it would be more convenient to have the Matson and Bennard note and mortgage made directly to the respondent, and that course was followed in making the renewal papers. There was direct evidence that appellant consented to the giving of the new mortgage to respondent which took the place of the mortgage to appellant a year before, and covered all oarlock cattle and increase, including the recently acquired Moles cattle. Subsequent renewals were made in the same way, and appellant made no objection until 1932, when he asserts he first learned that the bank had a mortgage on the cattle.

From 1922 until the time of trial in 1935 the oarlock cattle had been intermingled not only physically, but also by their description in mortgages given with appellant's consent to secure debts due the respondent. Apparently none of the interested parties has ever had

a thought that there was any reason to make any effort to distinguish the Leo Company cattle from the others.

Appellant's denial of knowledge of the mortgages to the respondent is not convincing. At the time of trial he was 75 years of age, and had no clear recollection of past events. He had forgotten that there ever was an indebtedness of Matson and Bennard to the respondent which he had guaranteed, and insisted that he had paid not only for the Leo Company cattle but also for the Pinedale and Moles cattle. Unsatisfactory also was the testimony of Matson who was friendly to appellant and seemed to desire to give the impression that the cattle which he repeatedly mortgaged to the respondent for indebtedness to the respondent, belonged to appellant, and that he thought the mortgages were to appellant instead of respondent. There can be no doubt that on disputed matters the trial court was justified in believing the testimony of respondent's witnesses who on many points were corroborated by documents and bank records.

In this connection, we may say that we cannot agree with appellant when he argues that the finding by the trial court that appellant was still the owner of the Leo Company cattle was equivalent to a finding that appellant did not know of the mortgage of November, 1922, to himself and did not consent to the mortgage of November, 1923, to the respondent.

We think the trial court's judgment was correct. Under findings warranted by the evidence appellant should not now be permitted, as against respondent, to rely upon the title to the Leo Company cattle which he claims he retained under the contract of conditional sale of December 1, 1920. A seller under a contract of conditional sale may be precluded from relying on his reserved title by consenting to a sale or mortgage by the conditional buyer to a third party who is led to believe that the conditional seller abandons his right

in the property. Keralis v. Agnew, 111 Minn. 522, 127 N. W. 440; Holman v. Roush, 118 Ark. 255, 176 S. W. 127; Jones v. Savin, 6 Boyce 180, 97 Atl. 591; Whidden v. Davidson, 120 Miss. 769, 83 So. 178; Jones on Chat. Mtg., (Bower's ed.) §§ 1204, 1233; Bogert's Commentaries on Cond. Sales, § 50. Often the decisions in such cases are put on the ground of waiver. It has been said that "waiver is a troublesome term in law." Williston on Contracts, § 678. It is applied in a variety of situations where it is difficult to find all the elements either of estoppel or contract. Williston, § 679. Perhaps the basis for the judgment in our case is "promissory estoppel" a term made popular by Professor Williston (on Contracts, § 139, § 679, et seq.) to denote a doctrine which the Restatement of Contracts, § 90, restates thus:

"A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

And see Vogel v. Shaw, 42 Wyo. 333, 294 Pac. 639, 75 A. L. R. 639.

Appellant's conduct with reference to the handling and mortgaging of the cattle justified a finding of an implied promise on his part to abandon any title he had in an undistinguishable part of the mortgaged property. It would seem that in accordance with the above principle the promise is binding because injustice can be avoided only by its enforcement.

The judgment will be affirmed.

*Affirmed.*

BLUME, Ch. J., and RINER, J., concur.